IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MARY MASCIULLI,**<br>　　　　　**Plaintiff,**<br><br>　　　　　v.<br><br>**IMPERIAL SECURITY SERVICES, INC.,**<br>**IMPERIAL SECURITY, INC., IMPERIAL**<br>**GUARD AND DETECTIVE SERVICES,**<br>**INC., JOHN DOE 1, AND ABC**<br>**CORPORATION A,**<br>　　　　　**Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO.  24CV4130** |

## MEMORANDUM OPINION

Plaintiff Mary Masciulli's ("Masciulli") husband, Bart Masciulli ("Mr. Masciulli"), was shot and killed in the parking lot outside the Cargo City FedEx facility where he worked. Masciulli, individually and as a personal representative of her husband's estate, sued Imperial Security Services, Inc. ("Imperial Security Services")—the security company hired by FedEx at Cargo City—as well as two affiliate companies, Imperial Security, Inc. and Imperial Guard and Detective Services (collectively "the Imperial Defendants") asserting claims for negligence, wrongful death, *see* 42 Pa. C.S. § 8301, a survival action, *see id.* § 8302, and loss of consortium. The Imperial Defendants have filed, pursuant to Federal Rule of Civil Procedure 56(a), a Motion for Summary Judgment on all claims.  For the reasons that follow, the Motion shall be granted.

### I.　　FACTUAL BACKGROUND

The following facts are undisputed.[1]

On October 7, 2022, Mr. Masciulli was shot and killed by Keith Blount ("Blount") in the parking lot outside the FedEx facility in Cargo City, Pennsylvania.  Mr. Masciulli was a long-

---

[1] Insofar as either party failed to properly address another party's assertion of fact and responded only with legal conclusions or argument, that fact is considered undisputed for the purposes of this Motion.  *See* Fed. R. Civ. P. 56(e).

time FedEx employee who worked as a driver and driver trainer.  Blount was one of Mr. Masciulli's trainees, hired as part of a program for ex-convicts in 2022.  After Blount failed a job-related test, he blamed Mr. Masciulli for that failure and, on October 7, 2022, went to FedEx Cargo City with a gun, intending to confront him.

On the day of the murder, Blount first arrived at the parking lot about two hours before the deadly encounter, while Mr. Masciulli was still working.  The parking lot—which was used by FedEx employees as well as other tenants of the Cargo City buildings—lacked any guard presence, gating, or barriers and could be accessed by members of the public.  Blount came and went from the parking lot several times in the ensuing two hours, his suspicious activity and loitering unnoticed by any FedEx employee or Imperial Security Services guard.  Although the guards did not monitor any live video feed of the facility—they did not have access to FedEx's cameras—CCTV captured the following details of Blount's movements:

- Around noon, Blount first entered the parking lot and left after a few minutes.
- Fifty minutes later, around 12:50 p.m., Blount returned to the parking lot and drove past Mr. Masciulli's car, before leaving again.
- Blount returned for a second time around 1:26 p.m. He parked his car near Mr. Masciulli's, got out and walked over to Mr. Masciulli's car, circled it, and then returned to his own vehicle where he waited for about 20 minutes before leaving.
- Fifteen minutes later, around 2:00 p.m., Blount returned to the parking lot for a third time. He parked and approached Mr. Masciulli—who was in his own car about to leave the parking lot—before shooting and killing him.

Two unarmed Imperial Security Services guards were on duty at the FedEx facility when the murder occurred.  One was stationed inside each of the two buildings leased by FedEx—Buildings C7 and C8.  These guards were posted near the building entrances and monitored the people entering and leaving the buildings, checking badges and ensuring people did not remove FedEx packages from the facility.  They were not roving guards, and were, in fact, prohibited from leaving their posts unguarded.  The guard schedule, which was developed by the local

2

FedEx Cargo City Security personnel, provided for near-24/7 coverage of these two posts.[2]  A third post—an outside position at Gate 27 which secured the cargo area between the two buildings—was not manned at the time.  Per the guard schedule, that post was only staffed during certain morning and evening hours.  That guard's primary duties were to let trucks in and out of the cargo area, verify the badges of drivers and helpers, and inspect the trucks for anything suspicious.  Gate 27 was closed and locked when no guard was present; Imperial Security Services did not provide roving or patrolling guards to check the parking lots or other areas around the exterior of the FedEx Buildings.

The provision of these guards was governed by a Master Services Agreement between Imperial Security Services and FedEx Corporate Services, which the two corporate offices signed in June 2021.  This nonexclusive global agreement was not specific to any individual FedEx facility or affiliate but instead outlined the overarching relationship between the corporate entities and the process by which each FedEx affiliate would select—and pay for—services offered by Imperial.  The contract contained a general description of services to be provided by Imperial Security Services, subject to the specific security needs articulated by FedEx, which "may include, but are not limited to, entry and egress access control, roving patrols of interior and exterior building areas, visitor and building employee identification verification, incident and daily operating reports, monitoring and responding to building intrusion detection systems, alarms, and fire detection equipment, responding as necessary to support other life safety duties and provide training as identified in Post Order and standard operating procedures."

When a FedEx location wished to engage Imperial Security Services to provide guards for a specific facility, the Master Services Agreement articulated a process in which the FedEx

---

[2] Per the guard schedule, the C8 post was manned 24/7; the C7 post was closed on Sundays and until 6:00 a.m. on Mondays but was otherwise continuously staffed.

affiliate would create a separate work order for that facility "completed in as much detail as possible." FedEx was also supposed to provide Imperial Security Services with Post Orders detailing the "site-specific responsibilities" for the guards to perform.

When FedEx and Imperial Security Services entered into this Master Services Agreement in June 2021, Allied Universal, a different security company, was providing security services at the Cargo City FedEx location. At some point in late 2021 or early 2022, FedEx Express—the affiliate which managed the Cargo City facility—decided to replace Allied Universal with Imperial Security Services. The parties executed a work order in March 2022, specifying that, beginning in mid-May 2022, Imperial Security Services would provide guards to FedEx Cargo City. The work order included the estimated hours—a total of 350 per week—and bill rate—for these guards. FedEx did not, however, issue any written post orders with Cargo City-specific instructions for Imperial.

Shortly after executing that work order, and before services were scheduled to begin, three Imperial Security Services representatives visited Cargo City. They toured the facility and discussed the site security responsibilities with the local FedEx management team and senior security specialist. These FedEx representatives informed Imperial Security Services that they were only hiring guards for three posts: C7, C8, and Gate 27. FedEx also provided a schedule allocating those 350 hours of guarding services among the three positions.

Imperial Security Services provided unarmed guards under the specifications orally communicated in that meeting and pursuant to the FedEx-provided schedule. Almost five months after they began providing these guards, Mr. Masciulli's was murdered.

## II.    LEGAL STANDARD

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North*

4

*Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986). "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead [s]he must show where in the record there exists a genuine dispute over a material fact." *Id.* at 256 (citing *Celotex*, 477 U.S. at 322-26). However, the non-movant is "entitled to all reasonable inferences from the underlying facts in the light most favorable to the non-moving party." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224 (3d Cir. 1993).

The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. *Trap Rock Indus., Inc. v. Loc. 825, Int'l Union of Operating Eng'rs, AFL-CIO,* 982 F.2d 884, 890 (3d Cir. 1992); *Fireman's Ins. Co. of Newark, N.J. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982). It is not enough to discredit the moving party's evidence, the nonmoving party is required to "present *affirmative* evidence in order to defeat a properly supported motion for summary judgment." *Anderson,* 477 U.S. at 257 (emphasis in original). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. *See Anderson,* 477 U.S. at 249-50. If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. *Celotex,* 477 U.S. at 323.

## III.    DISCUSSION

As a preliminary matter, wrongful death claims, survival actions, and loss of consortium claims are each derivative claims. *See Bright v. Westmoreland Cnty.,* 380 F.3d 729, 741 (3d Cir. 2004) ("[I]f the underlying tort theory [fails], then the wrongful death or survival claim will

fail."); *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 n.3 (3d Cir. 2007) (citing *Nigra v. Walsh*, 797 A.2d 353, 355 n.1 (Pa. Super. 2002)) (loss of consortium is derived from spouse's injury).  Rather than constituting independent substantive causes of action, they provide the mechanism through which a plaintiff may recover for unlawful or negligent conduct that resulted in death, *see* 42 Pa. C.S. § 8301(a) (permitting recovery of damages for death caused by wrongful act or negligence); 42 Pa. C.S. § 8302 (providing that causes of action survive the death of a party), or for a spouse to recover for the harms she suffered following her husband's injury or death, *see Scattaregia v. Shin Shen Wu*, 495 A.2d 552, 553 (Pa. Super. 1985) (loss of consortium depends on injured spouse's right to recover).  For each of these claims to succeed, there must be some underlying wrong for which a defendant is liable; absent that, the claims necessarily must fail.  Accordingly, for purposes of resolving the Motion for Summary Judgment, Masciulli's wrongful death, survival, and loss of consortium claims rise or fall with the viability of her underlying negligence claim.

To state a claim for negligence under Pennsylvania law, a plaintiff must establish that the defendant: (1) "owed a duty of care to the plaintiff;" (2) "that duty was breached;" (3) "the breach resulted in the plaintiff's injury;" and, (4) "the plaintiff suffered an actual loss or damages." *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 980 A.2d 502, 506 (Pa. 2009).  In their motion for Summary Judgment, the Imperial Defendants argue that Imperial Security Services had no duty to protect Mr. Masciulli in the parking lot, and thus, they breached no duty when they failed to prevent his death.

Whether or not Imperial Security Services owed a duty of care to Mr. Masciulli is a question of law to be determined by the court.  *See Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 221 (Pa. 2018).  "Duty, in any given situation, is predicated on the relationship

6

existing between the parties at the relevant time." *Morena v. South Hills Health System*, 462

A.2d 680, 684 (Pa. 1983). Only "certain relations between parties may give rise to such a duty."

*Wenrick v. Schloemann-Siemag Aktiengesellschaft*, 564 A.2d 1244, 1248 (Pa. 1989).

It is well-settled that the general principle under Pennsylvania common law is that "there

is no duty to control the conduct of a third party to protect another from harm." *Emerich v.*

*Phila. Ctr. for Hum. Dev.,* 720 A.2d 1032, 1036 (Pa. 1998). An exception, however, can arise

when a party voluntarily assumes a duty of reasonable care—gratuitously or otherwise—for the

protection of others.[3] Pennsylvania courts have adopted Section 324A of the Restatement

(Second) of Torts, *see e.g., Walters*, 187 A.3d at 224, which applies this protection to third

parties and provides that:

> One who undertakes, gratuitously or for consideration, to render services to another
> which he should recognize as necessary for the protection of a third person or his things,
> is subject to liability to the third person for physical harm resulting from his failure to
> exercise reasonable care to protect his undertaking, if
>    (a)  his failure to exercise reasonable care increases the risk of such harm, or
>    (b)  he has undertaken to perform a duty owed by the other to the third person, or
>    (c)  the harm is suffered because of reliance of the other or the third person upon the
>         undertaking.

Restatement (Second) of Torts § 324A. Thus, if a defendant entered into a contract to provide

security services but failed to exercise reasonable care in the provision of those services resulting

in harm to a third party, the defendant could be liable to that third party in tort, notwithstanding

the absence of the general duty to provide protection or privity of contract.

The duty to provide such protective services extends only as far as that party's

undertaking. In *Feld v. Merriam*, 485 A.2d 742, 747 (1984), the Pennsylvania Supreme Court

---

[3] Other exceptions, although not relevant in the present case, are when defendants "stand[] in some special relationship with either the person whose conduct needs to be controlled or in a relationship with the intended victim of the conduct, which gives to the intended victim a right to protection." *Emerich,* 720 A.2d at 1036 (citing Restatement (Second) of Torts § 315).

addressed this distinction in the context of duties landlords owed their tenants.  It held that,

although there was no *general* duty to provide protection from criminality of a third party, a

landlord could "incur a duty voluntarily or by specific agreement." *Id.*  In such cases, the

landlord "must perform the task in a reasonable manner and where a harm follows a reasonable

expectation of that harm, he is liable." *Id.*  However, this duty is limited to what the landlord

undertakes to provide:

> A tenant may rely upon a program of protection only within the reasonable expectations
> of the program. He cannot expect that a landlord will defeat all the designs of felonry. He
> can expect, however, that the program will be reasonably pursued and not fail due to its
> negligent exercise. If a landlord offers protection during certain periods of the day or
> night a tenant can only expect reasonable protection during the periods offered. If,
> however, during the periods offered, the protection fails by a lack of reasonable care, and
> that lack is the proximate cause of the injury, the landlord can be held liable. A tenant
> may not expect more than is offered. If, for instance, one guard is offered, he cannot
> expect the same quality and type of protection that two guards would have provided, nor
> may he expect the benefits that a different program might have provided. He can only
> expect the benefits reasonably expected of the program as offered and that program will
> be conducted with reasonable care.

*Id.*

Given that principle, the scope of Imperial Security Services' undertaking is dispositive.

If they did not undertake to provide security guards in the parking lot, or roving patrols, or

monitor camera feeds, any purported failure to do so cannot be negligent—their duty is limited to

the services they agreed to provide.  *See also Kerns v. Methodist Hosp.*, 574 A.2d 1068 (Pa.

Super. 1990) (perceived inadequacy of security program that failed to prevent a robbery on

guarded premises was not evidence of negligence).

Masciulli argues that the Master Services Agreement between FedEx and Imperial

Security Services is evidence that they did, in fact, agree to offer roving patrols, repeatedly citing

Attachment A-1, the General Description of Services appended to the Master Services

Agreement.  She further argues that Imperial's agreement in this contract to provide services "in

8

accordance with accepted industry standards" gave rise to duties to provide additional guards, secure the area around the exterior of the facility, and monitor CCTV feeds. But this global agreement, executed almost a year before FedEx engaged Imperial Security Services to guard this *specific* site, does not support such contention.

The Master Services Agreement, itself, is silent as to the particular security needs of any given FedEx location. In requiring site-specific work orders and post orders, it contemplated that each FedEx location would have different security requirements that they would need to communicate to Imperial Security Services. Facilities located near airports would require different certifications than ground facilities, and FedEx would have different obligations if they leased a portion of a building or if they were a sole tenant. The contract provided for these differences, mandating that the local FedEx office would communicate these needs to Imperial, through work orders and post orders, and that the guards would perform their duties under FedEx's technical direction. The contract does not, however, say that Imperial Security Services is obligated to perform duties beyond what was articulated by FedEx for a given site. It does not require them, on their own initiative, to monitor FedEx's CCTV feeds or provide guards beyond what FedEx agreed to pay for—in this case the 350 guard hours per week allocated among the three specified posts at Cargo City.

Nor does the General Description of Services, which states that Imperial Security Services would provide "a variety of services . . . which *may* include . . . roving patrols of the interior and exterior building areas" (emphasis added), "unambiguously" show that Imperial undertook to deliver these patrols at Cargo City. This possibility that roving patrols "may" be provided by Imperial Security Services—if needed to enforce FedEx security objectives—does not mean they must provide those patrols absent instruction from FedEx to do so. At best, it

9

indicates that Imperial Security Services was required to make the services available, to be provided if, and only if, FedEx requested and paid for them.

Thus, the only evidence in the record is that FedEx only engaged Imperial Security Services to provide unarmed guards at the three specified posts to monitor entry and egress. They did not contract for roving guards or exterior parking lot security. Because FedEx's engagement of Imperial Security Services defines the extent of their duties, and here there was no contractual duty to provide these roving patrols or additional exterior security, or to monitor FedEx's CCTV feed, Imperial Security Services had no tort duty to Mr. Masciulli to do so.

The murder of Mr. Masciulli and the loss suffered by his family is tragic. But absent a duty, there can be no breach, and no negligence. Since the negligence claim fails, so too must the derivative claims under the Wrongful Death Act and Survival Act, *Bright*, 380 F.3d at 741, and the claim for loss of consortium, *Scattaregia*, 495 A.2d at 553-54. And, because Masciulli is unable to establish the existence of one of the necessary elements for each of her claims, summary judgment must be granted for the Imperial Defendants.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

**WENDY BEETLESTONE, C.J.**